**SIGNED THIS: June 30, 2015**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DAVID P. McLAIN, | ) | Case No. 14-81071 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| DAVID P. McLAIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 14-8055 |
| | ) | |
| PENNY P. McLAIN, | ) | |
| Defendant. | ) | |

O P I N I O N

This matter is before the Court after trial on the complaint filed by the Plaintiff and Debtor, David McLain, against his ex-wife, the Defendant, Penny McLain, raising the issue whether certain divorce related obligations due Penny are nondischargeable domestic support obligations.

Married since 1970, Penny and David divorced in 2010, when they were both sixty years of age. The parties had five children together, all adults now. For the most part, Penny was a homemaker. She went to beauty school thirteen years ago and has worked

part-time as a beautician since then. Penny testified that she earned $16,000 to $17,000 in 2009. Her 2010 federal income tax return discloses earned income of $19,548. For the years 2011 to 2014, Penny's earned income was never higher than $23,532.

David was employed as a computer analyst by State Farm Mutual Auto Insurance Company from 1997 to 2012. His earned income was $73,636.73 in 2010, $75,829.70 in 2011 and $62,111.40 in 2012. After he retired from State Farm in 2012, he took a job with Graham Hospital as a security guard earning $9.70 per hour. David's earned income in 2013 was $10,672.11, but he also received pension and 401(k) distributions that year from State Farm totaling $68,718.01.

The Judgment for Dissolution of Marriage, entered September 3, 2010, incorporates by reference a Marital Settlement Agreement (MSA) that the parties had negotiated and agreed to in August, 2010. The MSA states that it is intended to settle "the matter of maintenance" and "rights of property of the parties." Article II of the MSA, entitled "Property Settlement," is comprised of eight numbered sections. Section 1, entitled "Real Estate," provides that Penny shall retain possession of the marital residence until it is sold, and shall receive the first $95,000 from the net sale proceeds, with any excess shared equally by the parties. That section also provides that real estate in Hollister, Missouri, an unimproved lot, will be listed for sale with the parties to share all expenses until sold, with Penny to receive the first $20,000 from the net sale proceeds, with any excess split equally.

Section 4 of Article II, entitled "Equalization Payment," the primary focus of the dispute, is set forth in full, as follows:

4. <u>Equalization Payment</u>

    Payments will be paid by DAVID to PENNY to equalize the

2

distribution of assets stated herein. Such payments shall be contingent upon DAVID's continued employment at State Farm Insurance Companies at no less than his present compensation. In the event that DAVID's employment at State Farm is terminated for any reason or his compensation is reduced such payments shall be reviewed and adjusted to some level to be agreed upon by the parties. In such event, the parties shall make an effort in good faith to agree upon a modified level of payments. In the event that such efforts do not result in an agreement the parties will attempt to resolve the issue through the services of a mediator or may apply to a court of competent jurisdiction for a ruling. Payments shall begin on the first day of the month following the approval of this agreement by the Court. DAVID will pay to PENNY the sum of $2,176 per month through July of 2015. In July of 2015 DAVID will pay to PENNY a final additional sum of $3,500. DAVID is responsible for all income taxes on the equalization payments.

Section 5 of Article II, entitled "Division of Pension," provides that in July, 2015, David will transfer to Penny through a Qualified Domestic Relations Order (QDRO) the sum of $926.50 per month from his State Farm pension, if he remains employed at State Farm as of July, 2015. If David is not employed at State Farm as of July, 2015, the transfer of a portion of his pension is to be reviewed and adjusted to a level to be agreed upon by the parties. On May 8, 2014, the McLean County Circuit Court entered a QDRO providing that commencing July, 2015, until David's death, Penny is to receive $926.50 per month from David's State Farm pension.

Section 8 of Article II, entitled "Maintenance," provides that neither party is entitled to maintenance from the other and both agree to waive any right to receive maintenance. Article III of the MSA, entitled "Debts," provides in the event of a bankruptcy filing by either party, the parties intend that the bankruptcy court, in determining whether or not to discharge the obligations created by the MSA, "consider these debts and their repayment as a form of support payment." It further provides the affirmative declaration of the parties to the bankruptcy court "that the distribution of debts and other provisions of this

Agreement are, in fact, truly support provisions and not a property distribution."

In conjunction with the MSA, David prepared a spread sheet intended to project a relative equality of wealth between the parties for the future period from 2010 to 2035. It reflects projected payments to Penny from David's pension totaling $359,500 over that time period. It also reflects projected annual social security benefits to be received by David beginning in 2016 of $24,122, increasing to $38,562.64 in 2035. Penny, not having participated in the Social Security retirement system, is not scheduled to receive any such benefits.

The parties used the spread sheet as the basis for the equalization payments set forth in section 4 of Article II of the MSA. At trial, David and Penny agreed that he needed to pay her in order to equalize their future incomes. David testified that it was his intent to "equalize everything," and he used the spread sheet as a tool to divide their assets and projected income equally. At first, David declined to characterize his future payments to Penny as "support." Penny characterized the future payments as "support" for her future and that the spread sheet was designed to show how she would be taken care of. David ultimately admitted that it was his intent to support Penny in the future. The spread sheet was intended to quantify that support and served as the source document for the equalization payments.

On June 30, 2014, the McLean County Circuit court found David to be in indirect civil contempt for not paying the equalization payments required in the MSA. The court entered two judgments against David in the amount of $13,056 plus interest at 9%, and in

4

the amount of $13,317.78 for Penny's attorney fees and costs.

David's adversary complaint seeks a determination as follows:

Count I: that his obligation under the MSA to pay half of the expenses relating to the Hollister, Missouri, real estate is not a domestic support obligation because it is not in the nature of alimony, maintenance or support.

Count II: that his obligation under the MSA to pay Penny equalization payments is not a domestic support obligation.

Count III: that his obligation under the Contempt Order to pay Penny the judgment amounts for unpaid equalization payments, attorney fees and costs is not a domestic support obligation.

David requests a dischargeability determination pursuant to 11 U.S.C. § 523(a)(5) as well as a determination that the obligations do not qualify for priority status under 11 U.S.C. § 507(a)(1).

## **ANALYSIS**

David got himself into a pickle when he took an early retirement from State Farm in 2012. The equalization payments he agreed to make in the MSA in August, 2010, $2,176 per month through July, 2015, contemplated his continued employment at State Farm until July, 2015. The Equalization Payment provision allows for modified payments in the event his employment terminates earlier, with Penny's consent or by judicial determination. When Penny refused to consent, the divorce court judge heard the matter. Refusing to modify the equalization payments, the state court held David in contempt for not making the payments, characterizing David's decision to take early retirement as a self-inflicted economic injury and a bad faith decision. David seeks to discharge his debt to Penny for

5

the unpaid equalization payments, contending that it is a property settlement obligation, not a support obligation.

Since retiring, David's financial condition has deteriorated significantly. In 2012, his last year working for State Farm, he earned $62,111 in wages, plus pension payments of $3,704. In 2013, he earned wages of $10,672 and received pension payments of $14,816. It also appears from his bankruptcy schedules that he withdrew $53,902 from his 401(k) account in 2013. On his schedule of income, David discloses $788 per month in net take home pay from his job as a security guard and $986 per month as a net pension distribution after a deduction for health insurance. His monthly income of $1,774 is offset by living expenses of $1,624 leaving $150 per month available to pay his creditors. He testified that beginning in July, 2015, as required by the MSA, Penny will begin receiving $926.50 per month from his pension leaving him almost nothing from that source of funds.

This Court, however, must disregard the current circumstances of the parties. When faced with a domestic support obligation (DSO) issue, it is not the function of a bankruptcy court to rewrite the terms of a divorce judgment based upon subsequent changes. The bankruptcy court's sole function is to ascertain the meaning of the judgment or marital settlement agreement at the time it was entered, which is primarily a question of the intent of the parties and/or the state court judge. *In re Smith,* 586 F.3d 69, 74 (1st Cir. 2009). A DSO is defined to include a debt owed to a former spouse that is "in the nature of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated." 11 U.S.C. § 101(14A). To discern intent, courts look to a range of factors, including the language used in the judgment or agreement and whether the award seems

6

designed to assuage need, as discerned from the structure of the award and the financial circumstances of the recipient. *Smith,* 586 F.3d at 74.

In Illinois, the term maintenance rather than alimony is used to define payment obligations intended to provide economic support to a former spouse. 750 ILCS 5/504. A support obligation can take several forms, including (1) periodic maintenance: payments for an indefinite period in an indefinite amount subject to modification in response to a change in the parties' circumstances; (2) maintenance in gross: a fixed sum of money, payable in installments for a fixed period of time, that is nonmodifiable; and (3) property settlements in lieu of maintenance: a lump sum payment, often payable in installments, given in exchange for a waiver of rights, including periodic maintenance, that is nonmodifiable. *In re Marriage of Adamson and Cosner,* 308 Ill.App.3d 759, 769, 721 N.E.2d 166 (Ill.App. 2 Dist. 1999). Periodic maintenance is the more common type of maintenance and is the preferred form since maintenance in gross is appropriate only in exceptional circumstances. *In re Marriage of Bohnsack,* 2012 IL App (2d) 110250, 968 N.E.2d 692, 694-95. A determination that an obligation is, in substance, part of a property settlement does not preclude a finding that it was in the nature of support for DSO purposes. *Marriage of Adamson,* 308 Ill.App.3d at 769-70 (exercising concurrent jurisdiction to determine whether a debt is dischargeable under section 523(a)(5)).

The party alleging that an obligation is a domestic support obligation bears the burden of proof, by a preponderance of the evidence. *In re Phegley,* 443 B.R. 154, 158 (8th Cir.BAP 2011); *In re Nugent,* 484 B.R. 671, 679 (Bankr.S.D.Tex. 2012). Exceptions from

discharge for spousal and child support are construed liberally in favor of the support recipient, as the policy underlying section 523(a)(5) and (a)(15) favors the enforcement of familial obligations over a fresh start for the debtor. *Phegley,* 443 B.R. at 158. Unless the state court was exercising concurrent jurisdiction to determine dischargeability under section 523(a)(5), a bankruptcy court is not bound by a state court's prior determination of the character of a divorce award since the bankruptcy court may look behind an order to determine the real nature of the obligations. *In re Trentadue,* 527 B.R. 328, 333 (Bankr.E.D.Wis. 2015). The primary areas of inquiry to determine the true nature of an obligation arising in a divorce judgment or marital settlement agreement are (1) the language and substance of the order or agreement in the context of the surrounding circumstances, using extrinsic evidence if necessary; (2) the parties' financial circumstances at the time of the order or agreement; and (3) the function served by the obligation at the time of the order or agreement. *Id.*

This Court has little difficulty determining that David's obligation to make equalization payments is in the nature of maintenance or support. At the time of the MSA and the judgment incorporating it, David was earning almost four times as much as Penny, whose earned income was not too far above poverty level as defined by the Department of Health and Human Services. Although Penny was to retain temporary possession of the marital residence, she was to list it for sale and was required to pay all associated expenses including the mortgage payments. The MSA provides for Penny to retain her savings account, but only up to $5,000 as of September 1, 2010.

Penny's receipt of a portion of David's State Farm pension was not scheduled to begin until July, 2015. The equalization payments were to be paid until July, 2015. Because

8

those payments terminated only when the pension payments began, it is obvious that the equalization payments were being used as a bridge to support Penny until she could begin receiving a portion of David's pension distributions.

The equalization payments were to be paid by David from his future wages earned at State Farm. When he took early retirement, he apparently simply stopped making the payments in reliance upon the MSA provision that makes the payments contingent upon David's continued employment at State Farm. The MSA characterizes the payments as necessary "to equalize the distribution of assets." It is clear from this and the spread sheet prepared by David that he considered his unearned future wages to be marital property, or its equivalent, to be distributed on an "equalized" basis. David's assumption is incorrect as a matter of law. Marital property may include property acquired by either spouse after the date of marriage but before the entry of a judgment of dissolution. 750 ILCS 5/503; *In re Marriage of Schmitt,* 391 Ill.App.3d 1010, 1017, 909 N.E.2d 221 (Ill.App. 2 Dist. 2009). Property acquired individually after the entry of the judgment of dissolution is nonmarital property. *In re Marriage of Nesbitt,* 2014 IL App (1st) 131825-U, 2014 WL 4384217; *In re Marriage of Mathis,* 2012 IL 113496, 986 N.E.2d 1139, 1150 (Garmin, dissenting); *In re Marriage of Waeckerle,* 219 Ill.App.3d 937, 940, 579 N.E.2d 1275 (Ill.App. 5 Dist. 1991).

When the marriage was dissolved on September 3, 2010, David's wages earned thereafter were nonmarital property. As such, those wages were not subject to allocation as marital property under 750 ILCS 5/503. Post-divorce wages are, however, the most common source for maintenance and support payments. David's spread sheet characterization of his post-divorce future wages as a marital asset will be disregarded and

9

given no weight, as it falls into the category of a labeling error.

The Court is persuaded that both David and Penny intended the equalization payments to be part of Penny's support between the time of the divorce and the commencement of the pension payments. Since alimony and maintenance is taxable income to the recipient, the spread sheet notation that "David pays income tax on alimony" is consistent with that intent. So is the last sentence of the Equalization Payment provision in the MSA that David is responsible for all income taxes on the equalization payments. The Court attributes the subsequent failure of Penny to declare the payments as income, and David's failure to claim a deduction, to neglect and general ignorance of the tax consequences of such payments. The fact that the MSA contains a boilerplate mutual waiver of maintenance is not conclusive and is overcome by the facts that support the determination that the equalization payments are truly in the nature of maintenance and support. In addition, the waiver of maintenance provision is contradicted by the subsequent provision on the same page of the MSA that "the distribution of debts and *other provisions* of this Agreement are, in fact, truly support provisions and not a property distribution." (emphasis added)

David points out that Penny's attorney at the contempt hearing in state court stated that the equalization payments issue "is not a maintenance case," suggesting that Penny should be bound by her attorney's argument made in divorce court. There are two problems with David's argument. First, a judicial admission in one court proceeding is not binding in separate litigation. *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1185 (7th Cir. 1996) (statement made in one lawsuit cannot be a judicial admission in another). Second,

judicial admissions are made about matters of fact, not conclusions of law. *McCaskill v. SCI Mgm't Corp.,* 298 F.3d 677, 682 (7th Cir. 2002) (Rovner, J., concurring). The scope of a judicial admission by counsel is restricted to unequivocal statements as to matters of fact, and does not extend to counsel's statements of their conception of the legal theory of a case. *Eli Lilly & Co. v. Valeant Pharmaceuticals Int'l,* 2011 WL 573761 (S.D.Ind. 2011). Penny's divorce attorney's arguments made to the state court are properly disregarded.

The Court determines that David's obligation to pay Penny the equalization payments provided for in paragraph 4 of Article II of the MSA, is a domestic support obligation that is nondischargeable under section 523(a)(5) and that is entitled to priority treatment under section 507(a)(1). It follows that the two judgments entered in conjunction with the contempt order carry the same aspects of nondischargeability and priority.

David's obligation under the MSA to pay half the expenses relating to the Hollister, Missouri real estate bears none of the common characteristics of a support obligation. The Court readily determines that obligation to be one within the scope of section 523(a)(15), not 523(a)(5).

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###